IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CODY GOODE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:18-cv-00319-Y |
| | § | |
| BNSF RAILWAY, INC., | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant BNSF Railway Company (incorrectly named as "BNSF Railway, Inc.")

("BNSF") files this Brief in Support of its Motion for Summary Judgment.

# TABLE OF CONTENTS

I.      SUMMARY .................................................................................................1

II.     IDENTIFICATION OF LIVE PLEADINGS ...........................................1

III.    FACTUAL BACKGROUND ....................................................................2

        A.      Goode Applies for Employment with BNSF..................................2

        B.      Goode Works for BNSF Performing Train-Service Work...........5

        C.      BNSF Medical Discovers That Goode Has a Defibrillator and
                Determines that He Cannot Perform Train-Service Work Safely. ...............8

        D.      The Safety Risks Involved in Use of an ICD While Performing Safety-
                Sensitive Train-Service Work. ..............9

        E.      BNSF Helps Goode Find a New Position as a Dispatcher. ....................... 14

        F.      Goode Later Experiences Events Involving His ICD. ............................... 16

        G.      Goode Files This Lawsuit. .................................................................17

IV.     ARGUMENT AND AUTHORITIES ....................................................17

        A.      BNSF is Entitled to Summary Judgment Based on the "Qualified"
                Element and the Direct-Threat Standard. ................................. 18

                1.      Safety, the railroad work environment, and the burden of proof. .... 18

                2.      The direct-threat standard. ........................................................ 22

                3.      Goode was not qualified and posed a direct threat........................... 23

        B.      BNSF is Entitled to Summary Judgment Because Goode Has No
                Evidence of Discrimination. ........................................................ 27

                1.      Goode has no direct evidence of discrimination. ............................. 28

                2.      Goode has no circumstantial evidence challenging BNSF's
                        reason for placing restrictions on his work activities........................ 28

        C.      BNSF is Entitled to Summary Judgment Because Its Practice of
                Excluding Individuals with Defibrillators from Working in Train-
                Service Jobs is Job-Related and Consistent with Business Necessity. ........ 30

                1.      BNSF's practice is job-related. ........................................................31

                2.      BNSF's practice is consistent with business necessity. ................... 32

        D.      Goode Has No Failure-to-Accommodate Claim......................................... 38

V.      CONCLUSION ..................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Acker v. Gen. Motors, L.L.C.*,
    853 F.3d 784 (5th Cir. 2017) ............................................................. 39

*Allmond v. Akal Security, Inc.*,
    558 F.3d 1312 (11th Cir. 2009) ......................................................32, 33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................... 38

*Atkins v. Salazar*,
    677 F.3d 667 (5th Cir. 2011) ............................................ 25, 31, 32, 33

*Bates v. United Parcel Serv., Inc.*,
    511 F.3d 974 (9th Cir. 2007) ............................................................. 30

*Bender v. Norfolk S. Corp.*,
    994 F.Supp.2d 593 (M.D. Pa. 2014) ................................................. 33

*Brotherhood of Locomotive Engineers and Trainmen, General Committee of Adjustment, Cent.
    Conference v. Union Pacific R. Co.*,
    719 F.3d 801 (7th Cir. 2013) ............................................................. 21

*Chandler v. City of Dallas*,
    2 F.3d 1385 (5th Cir. 1993) ............................................................... 18

*Chevron U.S.A. Inc. v. Echazabal*,
    536 U.S. 73 (2002) ............................................................................. 19

*Chiari v. City of League City*,
    920 F.2d 311 (5th Cir. 1991) ......................................................... 18, 24

*Conroy v. New York Dept. of Correctional Servs.*,
    333 F.3d 88 (2d Cir. 2003) ................................................................. 33

*Dao v. Auchan Hypermarket*,
    96 F.3d 787 (5th Cir. 1996) ............................................................... 39

*Daugherty v. City of El Paso*,
    56 F.3d 695 (5th Cir. 1995) ......................................................... 18, 24

*Diggs v. BNSF Ry. Co.*,
   742 F. App'x 1 (5th Cir. 2018) ................................................................. 29

*Donahue v. Consol. Rail Corp.*,
   224 F.3d 226 (3d Cir. 2000) ............................................................. 24, 36

*Durham v. Ascension Par. Sch. Bd.*,
   624 F. App'x 237 (5th Cir. 2015) (per curiam) ................................... 38

*EEOC v. Amego, Inc.*,
   110 F.3d 135 (1st Cir. 1997) ................................................................. 19

*EEOC v. Beverage Distributors Co., LLC*,
   780 F.3d 1018 (10th Cir. 2015) ........................................................... 23

*EEOC v. BNSF Ry. Co.*,
   853 F.3d 1150 (10th Cir. 2017) ........................................................... 23

*EEOC v. Exxon Corp.*,
   203 F.3d 871 (5th Cir. 2000) .......................................................... 30, 34

*Griffin v. United Parcel Serv., Inc.*,
   661 F.3d 216 (5th Cir. 2011) ................................................................. 39

*Jarvis v. Potter*,
   500 F.3d 1113 (10th Cir. 2007) ............................................... 19, 20, 23

*Knapp v. Northwestern Univ.*,
   101 F.3d 473 (7th Cir. 1996) ................................................................. 22

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ........................................................................ 27, 28

*McKenzie v. Benton*,
   388 F.3d 1342 (10th Cir. 2004) ........................................................... 20

*Michael v. City of Troy Police Dept.*,
   808 F.3d 304 (6th Cir. 2015) ................................................................. 22

*Nall v. BNSF Ry. Co.*,
   917 F.3d 335 (5th Cir. 2019) ......................................................... passim

*Painter v. Ill. Dep't of Transp.*,
   715 F. App'x 538 (7th Cir. 2017) ........................................................ 32

*Raytheon Co. v. Hernandez*,
   540 U.S. 44 (2003) ........................................................................................31

*Rizzo v. Children's World Learning Ctrs*,
   213 F.3d 209 (5th Cir. 2000) ................................................................... 20

*Rodriguez v. Eli Lilly & Co.*,
   820 F.3d 759 (5th Cir. 2016) ................................................................... 28

*Ruddell v. Triple Canopy, Inc.*,
   2016 WL 4529951 (E.D. Va. Aug. 29, 2016) ...................................... 33

*Skinner v. Ry. Labor Executives' Ass'n*,
   489 U.S. 602 (1989) ....................................................................20, 21, 34

*Thomas v. Corwin*,
   483 F.3d 516 (8th Cir. 2007) ................................................................... 33

*Turco v. Hoechst Celanese Corp.*,
   101 F.3d 1090 (5th Cir. 1996) .........................................................18, 19, 24

*U.S. v. E.E.O.C. v. AIC Investigations, Ltd.*,
   55 F.3d 1276 (7th Cir. 1995) ................................................................... 32

*Wilkerson v. Shinseki*,
   606 F.3d 1256 (10th Cir. 2010) ............................................................. 33

*Williams v. J.B. Hunt Transport, Inc.*,
   826 F.3d 806 (5th Cir. 2016) ................................................................... 28

*Wolfe v. U.S. Steel Corp.*,
   2013 WL 12099083 (N.D. Ohio July 12, 2013) ...........................30, 33

**Statutes**

42 U.S.C. § 12112(a) ....................................................................... 17, 18

42 U.S.C. § 12113(a) ............................................................................ 30

42 U.S.C. § 12113(b) .......................................................................19, 30

49 U.S.C. § 21101(5) ............................................................................ 20

49 U.S.C. § 21103 .................................................................................. 20

## Rules

Fed. R. Civ. P. 8(a)(2) ........................................................... 38

Fed. R. Civ. P. 30(b)(6) ......................................................... 14

Fed. R. Civ. P. 56(a) .............................................................17

## Regulations

29 C.F.R. § 1630.2(m). App. .................................................. 18

29 C.F.R. § 1630.2(r) ....................................................... 19, 22

49 C.F.R. § 220.309(e) ........................................................... 37

49 C.F.R. § 391.41(b)(4), App'x A, Medical Advisory Criteria ........................................ 36

49 C.F.R. § 209.301 ............................................................... 20

49 C.F.R. § 3209.303(a) ......................................................... 20

## Other Authorities

84 Fed. Reg. 3532, 3532-33 (Feb. 12, 2019) ...................................... 36

84 Fed. Reg. 26727, 26727-28 (June 7, 2019) .................................... 36

1990 U.S.C.C.A.N. 267 ........................................................... 33

FAA, Medical Certification Strategies in Response to Technologically Advanced
Prosthetic Devices,
https://www.faa.gov/data_research/research/med_humanfacs/oamtechreports/2010
s/media/201807.pdf ........................................................... 37

FAA, Order 3930.3C, Appendix A, Medical Standards, Item 7.a.(6),
https://www.faa.gov/documentLibrary/media/Order/FAA_Order_3930.3C.pdf .... 37

FAA Safety Briefing, Q.5 (July/August 2017),
https://www.faa.gov/news/safety_briefing/2017/media/JulAug2017.pdf) ............... 37

H.R. Rep. No. 101-485 ........................................................... 33

NTSB Safety Rec. R-13-021, https://www.ntsb.gov/SAFETY/safety-
recs/_layouts/ntsb.recsearch/Recommendation.aspx?Rec=R-13-021 ........................ 34

## I.   SUMMARY

BNSF seeks summary judgment on the following elements of Goode's claims and BNSF's defenses: Goode's disability-discrimination claim fails because (1) Goode cannot show that he was qualified for his position in that he could not *safely* perform the essential functions of the position, or, in the event that the Court treats the direct-threat issue as one only concerning an affirmative defense on which BNSF has the burden, because BNSF has shown that Goode posed a direct-threat to the health or safety of himself and others; (2) Goode cannot demonstrate a genuine issue of material fact as to whether BNSF acted out of discrimination—as opposed to BNSF's stated reason of safety—in disqualifying him from train-service work; and (3) BNSF's practice of disallowing those employees with an implantable cardioverter-defibrillator from working in safety-sensitive train-service jobs is job-related and consistent with business necessity. In addition, it is unclear whether Goode means to assert a claim for failure to accommodate, but BNSF provides several reasons as to why any such claim must fail.

## II.   IDENTIFICATION OF LIVE PLEADINGS

Plaintiff's Live Complaint: Plaintiff's First Amended Complaint, filed April 30, 2019, Doc. 17.

Defendant's Live Answer: Defendant's Answer to Plaintiff's First Amended Complaint, filed May 14, 2019, Doc. 18.

### III.   FACTUAL BACKGROUND

**A.   Goode Applies for Employment with BNSF.**

Goode applied for employment with BNSF as a conductor in 2006. App. 6-7, 11, 95-97 (Goode Dep. 39:9-40:4, 46:6-16; Application, Ex. 2 to Goode Dep.). The conductor position is one of several jobs within the "train-service" category, which includes conductor, switchman, and brakeman. App. 169 (Jarrard Dec. ¶ 4). Conductor, along with the other train-service jobs, is a safety-sensitive position that involves work on a train in over-the-road trips as well as working in a rail yard. App. 32-33, 38 (Goode Dep. 70:22-71:16, 76:17-19).

After an interview process, App. 11, 12-13 (Goode Dep. 46:17-20, 48:22-49:15), BNSF made Goode an offer of employment as a conductor, conditioned upon Goode's successful completion of a post-offer medical-evaluation process. App. 14, 15-16, 17; 105-06 (Goode Dep. 50:3-13, 51:20-52:13, 53:10-19; Jarrard Dep. 7:23-8:12). Comprehensive Health Services ("CHS"), a BNSF contractor, coordinated BNSF's post-offer, pre-employment medical-evaluation process for job candidates, including by facilitating certain post-offer medical examinations and other assessments. App. 169; 105-06, 113 (Jarrard Dec. ¶ 5; Jarrard Dep. 7:23-8:12, 17:6-13).

As part of that medical-evaluation process, candidates who received a conditional offer of employment were required to complete an online medical questionnaire. App. 169; 107, 105-06, 140-67. (Jarrard Dec. ¶ 5; Jarrard Dep. 9:10-23; 7:23-8:12 & Ex. 5). A nurse at CHS reviewed the questionnaire and, depending on the position sought and the

information provided in the questionnaire, would request any follow-up information needed. App. 169; 105-06 (Jarrard Dec. ¶ 5; Jarrard Dep. 7:23-8:12). In some cases, CHS would then approve the candidate for hire. App. 169 (Jarrard Dec. ¶ 5). In others, CHS would transmit information to BNSF's Medical and Employee Health department ("MEH Department"). App. 169 (Jarrard Dec. ¶ 5).

Goode completed and submitted the medical questionnaire. App. 14, 15, 16, 17, 18; 169, 177-82 (Goode Dep. 50:3-8, 51:20-22, 52:7-13, 53:10-19, 54:12-25; Jarrard Dec. ¶ 6 & Ex. 1). Goode had been diagnosed with dilated cardiomyopathy in 1998, App. 10, 45 (Goode Dep. 45:10-12, 85:21-23), and had a "pacemaker/defibrillator" implanted in his chest in 2003. App. 8, 46-47 (Goode Dep. 42:4-22, 89:14-90:1). The device was a single device containing both a pacemaker and an implantable cardioverter-defibrillator ("ICD"). App. 8-9, 46-47; 169-70 (Goode Dep. 42:11-43:8, 89:14-90:19; Jarrard Dec. ¶ 7). An ICD is a device placed in the chest to reduce the risk of dying if the lower chambers of the heart (ventricles) go into a dangerous rhythm and stop beating effectively (cardiac arrest). App. 169-70 (Jarrard Dec. ¶ 7). It is Goode's understanding that the pacemaker keeps his heart rate at a certain number of beats per minute and the ICD shocks the heart into a normal heart rate if "you go into defib." App. 47 (Goode Dep. 90:2-19).

On his medical questionnaire, Goode indicated that he had a pacemaker installed in 2003 but did not state that the device was a pacemaker *and* an ICD. App. 19-20, 26-27; 169, 170-71, 177-82; 105 (Goode Dep. 55:18-56:15, 63:14-64:10; Jarrard Dec. ¶¶ 6, 10 & Ex. 1; Jarrard Dep. 7:6-12). Goode recalls that he had his "cardiologist sign a piece of paper" and

got an x-ray of his right knee during the medical-evaluation process. App. 25, 27 (Goode Dep. 61:1-12, 64:11-16). Goode also submitted additional medical records from his cardiologist to CHS. App. 170-71; 109 (Jarrard Dec. ¶ 10; Jarrard Dep. 11:1-8).

CHS's clinical notes indicate that Goode spoke with one of its nurses about his medical questionnaire answers. App. 20-25; 169, 170-71, 177-82 (Goode Dep. 56:22-61:19; Jarrard Dec. ¶¶ 5-6, 10 & Ex. 1). The clinical notes further indicate that Goode told the CHS nurse that he had a pacemaker placed in July of 2003.  App. 26-27; 169, 170-71, 177-82  (Goode Dep. 63:14-64:25; Jarrard Dec. ¶¶ 6, 10 & Ex. 1). Goode cannot recall who he spoke with about his pacemaker or whether or not that person worked for BNSF, and he does not recall whether he had any other conversations during the application process. App. 26-27 (Goode Dep. 63:14-64:25). Goode also cannot recall whether or not he told this individual about his ICD. App. 43-44 (Goode Dep. 83:7-84:12). The notes of discussions Goode had with the CHS nurse, however, refer only to a pacemaker and not an ICD. App. 169, 170, 177-82. (Jarrard Dec. ¶¶ 6, 10 & Ex. 1).

Under the work process established between BNSF and CHS, if an applicant for a conductor position disclosed that he had cardiomyopathy and a pacemaker alone, CHS could medically qualify the applicant on its own. App. 111-12, 134-35 (Jarrard Dep. 13:24-14:19, 41:17-42:10). For other conditions, CHS was supposed to send the applicant's information to BNSF's MEH Department so that department could review it and make the medical-qualification determination. App. 118-19 (Jarrard Dep. 23:8-24:19). If an applicant

disclosed that he had a pacemaker *and* an ICD, CHS should have sent that information to BNSF for review. App. 111-12 (Jarrard Dep. 13:24-14:19).

Although some of the medical records Goode provided to CHS do mention that he had an ICD, App. 170-71; 108-10 (Jarrard Dec. ¶ 10; Jarrard Dep. 10:25-12:16), it is undisputed that CHS did not notify the BNSF MEH Department that Goode had an ICD. App. 190; 170-71 (Clark Dec. ¶ 4; Jarrard Dec. ¶ 10). CHS also did not transmit Goode's information to the MEH Department for review during Goode's post-conditional offer medical review process. App. 170-71 (Jarrard Dec. ¶ 10). Consequently, CHS did not transmit the records mentioning that Goode had a defibrillator to the MEH Department until sometime after Goode was hired. App. 110-11, 117-18 (Jarrard Dep. 12:9-13:23, 22:21-23:7). In short, it is undisputed that at the time he was hired no one in BNSF's MEH Department knew that he had an ICD.

Had the MEH Department been made aware that Goode had an ICD at the time, Goode would not have been approved for hire for the reasons discussed below. App. 170-71 (Jarrard Dec. ¶ 10). Nevertheless, CHS cleared Goode for hire in the conductor position, and BNSF hired him as a conductor, which also entailed him performing the related train-service jobs. App. 28-29, 98; 104 (Goode Dep. 65:1-66:22 & Ex. 5; Jarrard Dep. 6:12-15).

### B.   Goode Works for BNSF Performing Train-Service Work.

Generally, a conductor is responsible for the safe and efficient movement of trains. App. 169 (Jarrard Dec. ¶ 4). As a result of collective bargaining agreement requirements, conductors and other train-service employees work in different capacities, including work

on a train in an over-the-road trip as well as working in the rail yard. App. 172; 30-31, 32-34 (Jarrard Dec. ¶ 14; Goode Dep. 67:15-68:19, 70:22-72:6). Thus, Goode rotated between conductor, brakeman, and switchman jobs, App. 30-31 (Goode Dep. 67:15-68:19), and he split his time between working on the road and working in a rail yard. App. 32-33 (Goode Dep. 70:22-71:16).

Train-service employees work frequently around moving and heavy equipment. App. 172; 63, 37 (Jarrard Dec. ¶ 14; Goode Dep. 127:9-14, 75:6-8). As a conductor, Goode could move from sitting in the left seat on a locomotive, to riding on the side of moving trains, throwing switches, and moving trains with a remote control belt. App. 120-23; 30-31, 36-38, 41 (Jarrard Dep. 25:3-28:9; Goode Dep. 67:19-68:22, 74:11-76:13, 79:10-21).

When working in a rail yard, a train-service employee works a significant amount of time alone, communicating instructions to the engineer regarding the make-up of trains and switching of cars. App. 172; 33-35 (Jarrard Dec. ¶ 14; Goode Dep. 71:22-73:21). Goode agrees that he was responsible for communicating with the engineer—whether verbally, by radio, or using hand signals—both on the train and in a rail yard, App. 34, 35 (Goode Dep. 72:12-21, 73:3-21), and that his duties while in a rail yard included switching trains, putting cars in order, and switching out cars. App. 34 (Goode Dep. 72:7-11). That work required Goode to actually move the train cars around and organize them within the yard. App. 37-38 (Goode Dep. 75:9-76:13). Because a train-service employee may work between a set of tracks spaced as narrowly as 36 inches apart, he or she must be constantly aware and in control of his or her physical presence to be sure not to position himself or herself so near

a track as to be within striking distance of moving equipment on a track (called "fouling the track"). App. 172 (Jarrard Dec. ¶ 14).

On the road, a train-service employee performs various work tasks involved in moving the train from one point to another. App. 172 (Jarrard Dec. ¶ 14). A train-service employee climbs on and off equipment, rides on moving cars while holding onto a ladder, sometimes for an extended period of time, operates switches, pulls pins to separate cars during switching operations, and changes knuckles (the coupling device used to connect two cars). App. 172; 32-33, 34, 36, 37-38, 41 (Jarrard Dec. ¶ 14; Goode Dep. 70:22-71:6, 72:7-11, 74:11-22, 75:9-76:13, 79:10-21). Goode agrees that he rode on the side of moving trains by maintaining three points of contact—either two hands and one foot or two feet and one hand—which is a routine part of a conductor's job. App. 41; 173 (Goode Dep. 79:10-21; Jarrard Dec. ¶ 16).

In November 2009, Goode was placed on furlough (meaning off work for reasons unrelated to a medical condition). App. 57; 169-70 (Goode Dep. 112:5-11; Jarrard Dec. ¶ 7); Pl.'s Am. Compl. ¶ 1. Goode had a new ICD implanted while he was on furlough. App. 50-51 (Goode Dep. 100:24-101:18). It was Goode's understanding that the second ICD had a new battery but was otherwise the same type of device as the previous ICD—and that it was a combined pacemaker and ICD. App. 51 (Goode Dep. 101:14-24).

C.     **BNSF Medical Discovers That Goode Has a Defibrillator and Determines that He Cannot Perform Train-Service Work Safely.**

On April 7, 2010, BNSF sent Goode a letter recalling him to active service in Wichita Falls, Texas. App. 57-58, 99 (Goode Dep. 112:12-113:25; Ex. 9 to Goode Dep.). In connection with being recalled, Goode informed BNSF's MEH Department that he had an ICD. App. 169-70, 183-86; 189-90 (Jarrard Dec. ¶ 7 & Ex. 2; Clark Dec. ¶ 3).

Dr. Sharon Clark, a Field Medical Officer in BNSF's MEH Department, became aware that Goode had an ICD. App. 189-90 (Clark Dec. ¶¶ 2-4). Consistent with her job duties, Dr. Clark reviewed Goode's medical case to assess whether he could safely perform the essential functions of his train-service position. App. 189-90; 125, 126, 128-29; 170 (Clark Dec. ¶ 3; Jarrard Dep. 30:14-22, 31:9-20, 33:12-34:20; Jarrard Dec. ¶ 8). That was the first time that anyone in BNSF's MEH Department had reviewed the fact that Goode had an ICD. App. 190 (Clark Dec. ¶ 4).

After reviewing Goode's information, Dr. Clark placed the following restrictions on Goode:

- No operating moving or mobile equipment or vehicles

- No work within 3-foot radius of powered bearing heaters or welding cables

- No work within 12 inches of unshielded locomotive alternators when engine is powered

- No work at heights

- No work in which sudden incapacitation would be a hazard to self or others

App. 190, 193 (Clark Dec. ¶¶ 5-6 & Ex. A). Dr. Clark sent Goode a letter setting out those restrictions. App. 190, 194; 129-30 (Clark Dec. ¶¶ 5-6 & Ex. B; Jarrard Dep. 34:21-35:15). The effect of the combination of those restrictions on Goode was that he was unable to perform train-service work. App. 190-91; 115-16, 126 (Clark Dec. ¶ 7; Jarrard Dep. 20:25-21:10, 31:9-20). Goode agrees that those restrictions prevented him from returning to work in the conductor position. App. 59-60 (Goode Dep. 122:16-123:20).

Dr. Clark placed the restrictions on Goode because she determined those restrictions were necessary given the ICD device that Goode had and the nature of his train-service work. App. 190-91 (Clark Dec. ¶ 7). Dr. Clark acted only on the basis of a concern about safety and in her reasonable medical judgment. App. 190-91 (Clark Dec. ¶ 7). Moreover, and as explained more fully in the next section, Dr. Clark's evaluation and decision with respect to Goode were consistent with the regular practice of the MEH Department with respect to a train-service employee with an ICD. App. 170-71; 191 (Jarrard Dec. ¶ 10; Clark Dec. ¶ 10).

### D.   The Safety Risks Involved in Use of an ICD While Performing Safety-Sensitive Train-Service Work.

Safety is a top priority for BNSF, and the train-service position is a safety-sensitive position. App. 38-39 (Goode Dep. 76:14-77:5). For safety reasons, the use of an ICD is incompatible with train-service work. App. 170-71 (Jarrard Dec. ¶ 10). The reason is that an employee using an ICD is at risk for sudden incapacitation, and given the nature of train-service work therefore presents a substantial risk of significant harm. App. 171 (Jarrard Dec.

¶ 11). The cardiac condition requiring such a device itself presents the risk of sudden incapacitation—the purpose of an ICD is to restore a normal heartbeat and thus potentially save the life of an individual experiencing a cardiac event, but it does not guarantee consciousness of that individual. App. 171; 190-91 (Jarrard Dec. ¶ 12; Clark Dec. ¶ 7). Thus, the fact that Goode needed an ICD in itself demonstrated that he was at a risk of sudden incapacitation at a high enough level to warrant implanting the device. App. 190-91; 121-23, 131-34; 47, 49, 53, 55, 56 (Clark Dec. ¶ 7; Jarrard Dep. 26:20-28:9, 38:24-41:1; Goode Dep. 90:2-90:23, 92:9-23, 104:8-17, 108:13-18, 109:6-21).

Moreover, the firing of the device will likely render the individual incapacitated. App. 171; 190-91; 121-23, 131-34; 49, 53 (Jarrard Dec. ¶ 12; Clark Dec. ¶ 7; Jarrard Dep. 26:20-28:9, 38:24-41:1; Goode Dep. 92:9-23, 104:8-17). There is some potential for the device to misfire, which, as a type of firing, itself presents a risk of sudden incapacitation. App. 171 (Jarrard Dec. ¶ 12). But even if the device works exactly as it should, triggering a firing upon a cardiac event, the firing of the device very likely will render the person incapacitated for some period of time. App. 190-91; 171; 121-23, 131-34; 49, 53 (Clark Dec. ¶ 7; Jarrard Dec. ¶ 12; Jarrard Dep. 26:20-28:9, 38:24-41:1; Goode Dep. 92:9-23, 104:8-17).

Indeed, Goode himself described that aspect of the firing of the ICD. He admits that he has felt the ICD "shock" his heart on three occasions—twice within the first six months after the device's implantation and once in 2014 after Goode finished running a half marathon. App. 47-49; 203-04 (Goode Dep. 90:20-92:8; Medical Records). Goode also

produced medical records indicating that he felt the defibrillator "shock" his heart on at least one additional occasion in 2014. App. 204 (Medical Records re: 8/2014 shock).

Goode testified that the defibrillator shock is "just like being electrocuted" and "knocks you down." App. 47, 49 (Goode Dep. 90:15-21, 92:9-23). He also testified that he "thought somebody hit [him] in the back with a two by four." App. 49 (Goode Dep. 92:9-11). Moreover, Goode admits that if his ICD "shocked" him, or fired, while he was performing certain of his duties as a conductor, it would present a significant safety risk to him. App. 62-65 (Goode Dep. 126:11-129:4).

Given the safety-sensitive nature of train-service work, any increased risk of incapacitation would place an individual (or others) in a hazardous or potentially life threatening situation. App. 191; 171-72; 121-23, 131-34 (Clark Dec. ¶ 8; Jarrard Dec. ¶ 13; Jarrard Dep. 26:20-28:9, 38:24-41:1). The actions of conductors and other train-service employees can affect the safety of other railway workers and the public in a variety of situations. App. 191; 171-72 (Clark Dec. ¶ 8; Jarrard Dec. ¶ 13). The consequences of sudden incapacitation while performing train-service work could be injury to the employee, his or her coworkers, or the general public, including a catastrophic rail accident. App. 171-72 (Jarrard Dec. ¶ 13).

There are numerous examples of the serious risks involved with incapacitation and train-service work, some of which are as follows:

- Train-service employees frequently work around or on heavy moving equipment. App. 172; 191; 63 (Jarrard Dec. ¶ 15; Clark Dec. ¶ 8; Goode Dep.

127:9-14). In the event the individual becomes incapacitated, he or she is at risk of being run over or struck by moving equipment resulting in fatality or significant injury. App. 172; 191; 63-65 (Jarrard Dec. ¶ 15; Clark Dec. ¶ 8; Goode Dep. 127:9-129:4). That is especially so in a rail yard environment where, as discussed above, there are numerous tracks and frequent movement of large equipment in various directions. App. 172 (Jarrard Dec. ¶ 15).

- A routine part of a conductor's job is riding on the side of a moving railcar. App. 173; 43 (Jarrard Dec. ¶ 16; Goode Dep. 79:10-21). When riding on the side of a moving railcar, a conductor must maintain three-point contact (gripping with at least one hand and having both feet planted, or gripping with two hands and having one foot planted). App. 173; 43 (Jarrard Dec. ¶ 16; Goode Dep. 79:10-21). But if a conductor experiences an incapacitating event during that process, such as a defibrillator firing, the conductor very likely will not be able to maintain a grip and footing on the side of the railcar and therefore likely will fall off the moving train, which in any scenario can cause injury. App. 173; 62-63 (Jarrard Dec. ¶ 16; Goode Dep. 126:11-127:8). Further, that fall could occur over treacherous terrain or, worse, momentum could push the conductor's body under the side of the railcar where he or she very likely would be seriously injured or killed. App. 173 (Jarrard Dec. ¶ 16).

- If a train-service employee becomes incapacitated while communicating to the engineer about movement of the locomotive, even for a short time period, the

train could continue moving until the engineer realizes the conductor is no longer communicating and stops the train. App. 173 (Jarrard Dec. ¶ 17). Depending on the location, that scenario can produce serious injury or loss of life not only to the conductor but to others in the same area. App. 173 (Jarrard Dec. ¶ 17).

- A conductor in the train-service craft also wears a remote control belt that actually moves the trains in the rail yard. App. 121-24 (Jarrard Dep. 26:20-29:6). There is no engineer on the train and, if the conductor became incapacitated while performing this work, fell down, and was not able to stop the train, it could continue to move. App. 121-24 (Jarrard Dep. 26:20-29:6).

- In the event of a conductor becoming incapacitated, attempting to rescue such an incapacitated person also places fellow employees at an increased safety risk. App. 191; 173 (Clark Dec. ¶ 8; Jarrard Dec. ¶ 18).

In addition, under the collective bargaining agreements governing train-service work, conductors and other TYE employees are required to become locomotive engineers. Therefore, safety in that role must also be taken into account. App. 191; 173; 120-23 (Clark Dec. ¶ 9; Jarrard Dec. ¶ 19; Jarrard Dep. 25:3-28:9). There are numerous significant safety risks presented by the potential incapacitation of a locomotive engineer. App. 173 (Jarrard Dec. ¶ 19). Among others, locomotive engineers are responsible for the operation of trains, including those that carry hazardous materials. App. 191; 173; 120-23 (Clark Dec. ¶ 9; Jarrard Dec. ¶ 19; Jarrard Dep. 25:3-28:9). Incapacitation while performing that role and

operating a locomotive could result in collision or a hazardous material spill with significant impact on BNSF, its employees, and the communities in which it operates. App. 191; 173 (Clark Dec. ¶ 9; Jarrard Dec. ¶ 19).

For all of those reasons, BNSF's consistent regular practice has been to disallow those individuals who have an ICD from working in train service jobs. App. 174; 191 (Jarrard Dec. ¶ 21; Clark Dec. ¶ 10). Dr. Michael Jarrard, BNSF's Assistant Vice President of Medical and Employee Health, is not aware of any BNSF employee with an ICD who has been knowingly permitted by the MEH Department to work as a train-service employee. App. 168, 174 (Jarrard Dec. ¶¶ 2, 21).[1] Had Dr. Jarrard known in 2006 that Goode had an ICD, he would have determined that Goode was not medically qualified for the conductor position. App. 102, 120-21, 133-34 (Jarrard Dep. 4:5-9, 25:3-26:5, 40:2-41:1). On the other hand, if Goode had only a pacemaker and not an ICD, he likely would have been approved to perform train-service work. App. 135-36 (Jarrard Dep. 42:14-43:5).

### E.    BNSF Helps Goode Find a New Position as a Dispatcher.

After Goode was disqualified from train-service work, Rick Folley, a former employee in BNSF's MEH Department, began working with Goode to find him a different position with BNSF. App. 195-201; 61, 66, 68, 71-72; 174, 183-86 (Folley Dec. ¶¶ 2-7 & Ex. 1; Goode Dep. 124:9-25, 131:1-9, 133:13-24, 136:25-137:12; Jarrard Dec. ¶ 20 & Ex. 2). As

---

[1] Dr. Jarrard is testifying as a fact witness, a witness designated pursuant to Fed. R. Civ. P. 30(b)(6), and as an expert witness. *See* App. 206-07 (Def.'s Expert Disclosures).

part of his efforts to help Goode find a new job, Folley monitored job postings, reviewed opportunities with division management, and scheduled Goode to take tests for various positions. App. 196-201 (Folley Dec. ¶¶ 6-7 & Ex. 1). Folley located an open position for a clerk in Fort Worth, Texas, but Goode failed the typing test for that position. App. 67-68; 197-201 (Goode Dep. 132:15-133:12; Folley Dec. ¶ 7 & Ex. 1). Goode also failed a First-Line Supervisor (FLS) Assessment Test that Folley arranged for him to take to qualify for entry-level supervisory positions. App. 69-70; 197 (Goode Dep. 134:23-135:14; Folley Dec. ¶ 7). Folley also mentioned and discussed the possibility of a dispatcher position with Goode. App. 67-68; 197-201 (Goode Dep. 132:15-133:7; Folley Dec. ¶ 7 & Ex. 1). Folley arranged for Goode to take, and he passed, the Dispatcher Aptitude Test. App. 69-70; 197 (Goode Dep. 134:23-135:14; Folley Dec. ¶ 7).

A dispatcher is responsible for train traffic control. App. 72 (Goode Dep. 137:17-18). A dispatcher is also a safety-sensitive railroad job. But unlike train service, as a dispatcher there are numerous other employees working in the same room who could step in as needed in the event of an incapacitating incident. App. 174; 72-73, 80 (Jarrard Dec. ¶ 21; Goode Dep. 137:17-138:4, 147:7-18). Moreover, the engineers who take direction and secure approval for movement from dispatchers understand that if a dispatcher becomes silent the engineer is to go no further than previously approved to travel. App. 174 (Jarrard Dec. ¶ 21).

After he passed the dispatcher test BNSF offered Goode the opportunity to attend the next dispatcher training class, scheduled for January 2011, and after his training period

he became a dispatcher. App. 4-5, 70-71; 174, 183-86 (Goode Dep. 28:19-29:12, 135:15-136:24; Jarrard Dec. ¶ 20 & Ex. 2). Goode successfully completed the train dispatcher training program and is currently working for BNSF as a dispatcher. App. 3, 72 (Goode Dep. 5:20-22, 137:13-16).

## F.      Goode Later Experiences Events Involving His ICD.

In February 2013, Goode reported feeling lightheaded while sitting at a desk at work. App. 74, 75-76 (Goode Dep. 141:15-19, 142:20-143:2). Someone at BNSF called an ambulance and Goode went to the hospital. App. 75-76 (Goode Dep. 142:20-143:12). Goode reported that he was experiencing palpitations, that his heart was beating irregularly, and that he felt like passing out. App. 76-78 (Goode Dep. 143:13-145:3). Goode's ICD did not engage or shock him during this incident. App. 78 (Goode Dep. 145:4-19). Goode's cardiologist reportedly told him that it was simply an irregular heartbeat and that everyone has them. App. 79-80 (Goode Dep. 146:10-147:3).

Sometime in 2013 or 2014, Goode finished running a half marathon and his ICD shocked him. App. 47-49 (Goode Dep. 90:20-92:23). Goode dropped to a knee, his wife grabbed him, the ICD shocked him again, and it also shocked his wife. App. 53-54 (Goode Dep. 104:8-105:4). Goode believes the ICD might have shocked him because he was dehydrated, but is not certain about what caused the ICD to fire. App. 53-54 (Goode Dep. 104:11-105:7).

In 2017, Goode took a medical leave of absence to have his third ICD implanted. App. 51-52, 81-82 (Goode Dep. 101:25-102:7, 150:11-151:3). In March 2018, Goode

requested and was granted intermittent FMLA leave for visits to his cardiologist for treatments and "flare-ups." App. 82-87 (Goode Dep. 151:4-156:15).

### G.   Goode Files This Lawsuit.

Goode filed a charge of discrimination with the EEOC. App. 205 (EEOC Charge). The charge languished for many years at the EEOC but eventually Goode received a notice of right to sue and filed this lawsuit. Doc. 1, Pl.'s Compl. ¶¶ 6-8. He alleges that BNSF discriminated against him "on the basis of disability when it refused to return him to work" in violation of the ADA. Doc. 1, Pl.'s Compl. ¶¶ 21-22; *see also* Doc. 17, Pl.'s Am. Compl. ¶¶ 19-20. The only medical condition that Goode is claiming is the basis of this lawsuit is his dilated cardiomyopathy. App. 10 (Goode Dep. 45:4-23).

### IV.   ARGUMENT AND AUTHORITIES[2]

Goode claims that BNSF discriminated against him on the basis of disability when it refused to return him to work. Pl.'s First Am. Compl. ¶ 19. To prevail on his disability-discrimination claim, Goode must prove he has a disability, is a qualified individual, and that BNSF discriminated against him on the basis of a disability. 42 U.S.C. § 12112(a). Here, as in other employment-discrimination cases, Goode "may present his case by direct or circumstantial evidence, or both." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). For purposes of this motion, BNSF does not challenge Goode's contention that

---

[2] As the Court is aware, summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

dilated cardiomyopathy constitutes a disability. *See* App. 10 (Goode Dep. 45:4-23). Summary judgment nevertheless is appropriate for the reasons stated below.

### A.    BNSF is Entitled to Summary Judgment Based on the "Qualified" Element and the Direct-Threat Standard.

The ADA prohibits employment discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA's "qualified" standard has two parts. The first part relates to whether the employee holds appropriate licenses, certifications, degrees, and other basic requirements. The second part concerns whether the employee can perform the essential functions of the position at issue. *See* 29 C.F.R. § 1630.2(m). App. As to the "qualified" element of Goode's claim, only the second part of the "qualified" standard is at issue, along with the related direct-threat issue. Goode cannot show that he is qualified for train-service work, or, if the Court considers the direct-threat issue to be part of BNSF's burden, BNSF has shown that Goode posed a direct threat to the health and safety of himself and others.

### 1.    Safety, the railroad work environment, and the burden of proof.

To be "qualified," an employee must be able to *safely* perform the duties of his or her employment. *See Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996) ("Turco is not only unqualified because he cannot perform the essential functions of his job, but he is also unqualified due to the safety risk that he imposes upon himself and others."); *accord Daugherty v. City of El Paso*, 56 F.3d 695, 698 (5th Cir. 1995) (citing *Chandler v. City of Dallas*, 2 F.3d 1385 (5th Cir. 1993); *Chiari v. City of League City*, 920

F.2d 311, 315-16 (5th Cir. 1991)). The ADA also recognizes that an employer need not allow an employee to work if the employee poses a "direct threat" to the health or safety of the employee or others. *See* 42 U.S.C. § 12113(b); 29 C.F.R. § 1630.2(r); *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002); *Nall*, 917 F.3d at 342.

Although *Turco* and the other the Fifth Circuit cases cited above treat safety issues as part of the plaintiff's burden, the Fifth Circuit recently stated that it has not settled the issue of which party bears the burden of proving direct threat. *Nall*, 917 F.3d at 343 n.5. For the reasons discussed below, the Court should treat the issue as part of Goode's burden, but even if it is BNSF's burden, BNSF has satisfied the burden and therefore is still entitled to summary judgment.

Some courts have held that although direct threat generally is a defense, when the job duties implicate the safety of others the question of safety is properly considered as part of the plaintiff's burden to prove he or she is qualified. *See Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) (recognizing an exception to the general rule that the existence of a direct threat is a defense to be proved by the employer: "where the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that she can perform those functions without endangering others."); *see also EEOC v. Amego, Inc.*, 110 F.3d 135, 142–44 (1st Cir. 1997) (whether employees pose a direct threat is part of the analysis of whether they are otherwise qualified when essential job functions concern safety of others).

In *Rizzo v. Children's World Learning Ctrs*, 213 F.3d 209, 212-13 & n.4 (5th Cir. 2000) (en banc), the Fifth Circuit noted the issue but did not decide it because the case called for plain-error review. *Rizzo* did, however, cite *Amego* and describe the EEOC's position, in language that the Tenth Circuit has since relied on for the rule repeated in *Jarvis*, that "where the essential job duties necessarily implicate the safety of others, the burden may be on the plaintiff to show that she can perform those functions without endangering others...." *Id.* at 213 n.4; *see McKenzie v. Benton*, 388 F.3d 1342, 1354 (10th Cir. 2004) (relying on *Rizzo*).

The Court need not decide generally who has the burden of proof on direct threat. It should, however, follow the rule suggested in *Rizzo* and adopted by other courts—when the nature of the job involves safety risks to others, the plaintiff has the burden. Because Goode's train-service position was without question one that fit within that category, Goode has the burden of proof.

Specifically, train-service work is part of a category of railroad jobs considered to be "safety-sensitive" under federal law. *See* 49 C.F.R. §§ 209.301, 209.303(a) (covering railroad employees subject to Hours of Service Act, which includes train-service employees, 49 U.S.C. §§ 21101(5), 21103). The Supreme Court has described those positons as involving the "discharge [of] duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences" *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 628 (1989). The Supreme Court also stated: "Much like persons who have routine access to dangerous nuclear power facilities" train-service

(and other railroad) workers "can cause great human loss before any signs of impairment become noticeable to supervisors or others." *Id.* (internal citations omitted); *see also Brotherhood of Locomotive Engineers and Trainmen, General Committee of Adjustment, Cent. Conference v. Union Pacific R. Co.*, 719 F.3d 801, 804 (7th Cir. 2013) (Railroad "employees who are not sufficiently healthy, alert, and fit for work can pose grave dangers to themselves and to many others.").

Goode admits that the conductor position is a safety-sensitive position. App. 38-39 (Goode Dep. 76:14-77:5). Further, as set out in the examples in section III.D. above, the actions of conductors and other train-service employees can affect the safety of other railway workers and the public in a variety of situations. App. 191; 171-72 (Clark Dec. ¶ 8; Jarrard Dec. ¶ 13). Thus, the consequences of sudden incapacitation while performing train-service work could be injury to the employee, his or her coworkers, or the general public, including a catastrophic rail accident. App. 171-72 (Jarrard Dec. ¶ 13).

Accordingly, if the Court adopts the approach in *Rizzo*, it should hold that Goode has the burden on direct threat as part of showing that he is qualified. But even if the Court treats the issue as one only concerning an affirmative defense on which BNSF has the burden, the evidence is sufficient to satisfy such a burden. Thus, the Court may decide that it need not reach the question of the proper burden on direct threat. Because of the relationship between the issues, BNSF addresses the qualified/direct-threat issues together.

2.      **The direct-threat standard.**

The EEOC has defined direct threat to mean "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). In assessing whether an employee poses a direct threat, an employer must exercise reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. *Id.* Such evidence can include (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. *Id.*

Importantly, the question for purposes of the direct-threat analysis is *not* whether BNSF was correct about the risk Goode posed. *Nall*, 917 F.3d at 346 n.8 ("We emphasize that a correct conclusion is not required to satisfy the objective reasonableness standard."). Indeed, even in cases where doctors have expressly disagreed with the employer courts have held that there is no genuine factual dispute. *See Knapp v. Northwestern Univ.*, 101 F.3d 473, 485 (7th Cir. 1996) ("We do not believe that, in cases where medical experts disagree in their assessment of the extent of a real risk of serious harm or death, Congress intended that the courts — neutral arbiters but generally less skilled in medicine than the experts involved — should make the final medical decision."); *Michael v. City of Troy Police Dept.*, 808 F.3d 304, 309 (6th Cir. 2015) ("Reasonable doctors of course can disagree—as they disagree here—as to whether a particular employee can safely perform the functions of his job. That is why the law requires only that the employer rely on an 'objectively reasonable'

opinion, rather than an opinion that is correct."); *EEOC v. Beverage Distributors Co., LLC*, 780 F.3d 1018, 1021-22 (10th Cir. 2015) (holding that district court incorrectly instructed jury that the defendant had to prove that the employee actually posed a direct threat: "Beverage Distributors should have avoided liability if it had reasonably believed the job would entail a direct threat; proof of an actual threat should have been unnecessary."); *Jarvis*, 500 F.3d at 1122 ("[T]he fact-finder does not independently assess whether it believes that the employee posed a direct threat."). If it were otherwise, it would be impossible in practice to show a direct threat.

Nor is there any requirement that a medical decision be made only by a physician who personally examines the individual, as opposed to one who reviews medical information about the individual. *See EEOC v. BNSF Ry. Co.*, 853 F.3d 1150, 1158 (10th Cir. 2017) (reviewing medical records constitutes ADA individualized inquiry even absent communication with employee or physician). As Dr. Jarrard explained, making decisions based on a review of records and medical knowledge is a common and accepted medical-decisionmaking practice. App. 175-76 (Jarrard Dec. ¶ 25).

### 3.    Goode was not qualified and posed a direct threat.

Dr. Clark reviewed Goode's medical case and relied upon her medical knowledge, occupational medicine training and experience, knowledge of the railroad work environments and railroad activities, and the basic principles and practices of occupational medicine to conclude that Goode presented a significant risk of substantial harm in performing perform train-service work. App. 189-91 (Clark Dec. ¶¶ 2-3, 7). In particular,

Dr. Clark considered, among other things, that Goode's ICD "demonstrated that he was at a risk of sudden incapacitation"; the risk of sudden incapacitation presented, particularly given the nature of train-service work, a significant risk of substantial harm; and any increased risk of incapacitation would place an individual (or others) in a hazardous or potentially life threatening situation. App. 190-91 (Clark Dec. ¶¶ 7-9). On the whole, Dr. Clark's medical judgment was that Goode's underlying condition and ICD presented significant safety risks in the performance of train-service work.

Dr. Clark's determination regarding Goode's inability to safely work was medically reasonable and therefore permissible under the ADA, and Goode cannot demonstrate otherwise. Thus, BNSF is entitled to summary judgment. *See Nall*, 917 F.3d at 342-47; *Turco*, 101 F.3d at 1094; *Daugherty*, 56 F.3d at 698; *Chiari*, 920 F.2d at 315-16; *see also Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 230-32 (3d Cir. 2000) (Alito, J.) (upholding summary judgment for a railroad in a direct threat case based on safety-sensitive nature of job and risks posed by employee's medical condition).

Indeed, Goode testified that his ICD has "shocked" him on multiple occasions. App. 47-49; 203-04 (Goode Dep. 90:20-92:8; Medical Record), and he produced medical records indicating that he felt the defibrillator "shock" his heart on at least one additional occasion in 2014. App. 204 (Medical Record). He described the shock as plainly incapacitating. Specifically, Goode testified that on one of those occasions, he finished running a half marathon, his ICD shocked him, he dropped to a knee, his wife grabbed him, the ICD shocked him again, and the ICD also shocked his wife. App. 47-49, 53-54 (Goode

Dep. 90:20-92:23, 104:8-105:4). Goode explained that he "thought somebody hit [him] in the back with a two by four", that it was "just like being electrocuted", and the shock "knocks you down." App. 47-49 (Goode Dep. 90:15-21, 92:9-23). Moreover, Goode *admits* that if his ICD "shocked" him or fired while he was working as a conductor, it would present a significant safety risk to him. App. 62-65 (Goode Dep. 126:11-129:4). Accordingly, Goode's own testimony is sufficient to hold that he presented a direct threat to himself.

Moreover, it is immaterial that Goode performed train-service work for a period of time when BNSF's MEH Department was unaware of his ICD and has no record that he sustained any medical issue during that work. App. 128-29 (Jarrard Dep. 33:12-34:20). That simply means that Goode (and others) were fortunate during that time, not that he does not pose a significant risk. App. 174-75 (Jarrard Dec. ¶ 22). Further, the cases make clear that an employer need not wait for an incident to occur before taking action when becoming aware of a safety risk. *See, e.g., Atkins v. Salazar*, 677 F.3d 667, 683 (5th Cir. 2011) (noting "NPS is not required to wait until after there is an emergency to take action protective of the public and its employees" and finding that the "consequences of Atkins experiencing hypoglycemia while carrying out a dangerous arrest, responding to a medical emergency, or fighting a fire are sufficiently large to justify NPS's revocation of his law enforcement condition on the basis of even a small risk of hypoglycemia").

As one final issue on this ground for summary judgment, BNSF will briefly address the d in *Nall v. BNSF Ry. Co.* reversing summary judgment in a fractured opinion.[3] Despite that result, this is a very different case on which summary judgment is appropriate under the standards set out in *Nall*. The differences between the two cases are significant. In *Nall*, BNSF had performed a field test with Nall and had engaged in numerous communications, leading Nall to contend that BNSF had changed the standards on him during the evaluation process. *Id.* at 344. He also alleged that BNSF had modified the job requirements, *id.* at 343, "to incorporate tasks that an individual with Parkinson's may have trouble performing." *Id.* at 346. In addition, the employee pointed to alleged comments by BNSF employees that Nall "was 'never coming back to work' and that 'people with Parkinson's don't get better.'" *Id.* at 346. Here, unlike *Nall*, there is no allegation that anyone at BNSF made any negative comments about Goode's alleged disability or Goode's ICD. To the contrary, Goode testified that he does not recall anyone at BNSF ever saying anything negative about his device or about his cardiomyopathy. App. 55 (Goode Dep. 108:1-7). There also is no suggestion that BNSF modified the job duties to address Goode's medical condition or his ICD. And finally, this case involves risks presented by a medical device,

---

[3] Although as set out in the text, this case is easily distinguished from *Nall*, it is important to be aware just how fractured the opinion is. The majority opinion did not find support in the vote of a second judge. The concurring judge "specially concurred," meaning that judge did not join the majority opinion. Nor, of course, did the dissenting judge. Thus, the opinion is essentially a plurality opinion that resolved only the case before it. As a result, the specific reasoning of the single-judge majority opinion does not serve as precedent in later cases.

and Goode, unlike Nall, *admits* that his device firing—which he has no way to predict—
would render him a significant safety risk to himself. App. 47-49, 62-65 (Goode Dep. 90:20-
92:8, 126:11-129:4). In short, this is a very different case from *Nall*, and the court's decision
in *Nall* does not affect BNSF's entitlement to summary judgment in this case.

Accordingly, BNSF's determination regarding Goode's inability to safely work in
the train-service series of jobs was medically reasonable and therefore permissible under
the ADA. Therefore, Goode cannot demonstrate that he was qualified, or alternatively,
BNSF has demonstrated that the direct-threat standard is satisfied. BNSF thus is entitled
to summary judgment.

## B.   BNSF is Entitled to Summary Judgment Because Goode Has No Evidence of Discrimination.

As stated above, Goode may use "direct or circumstantial evidence, or both" to
prove his disability-discrimination claim. *Nall*, 917 F.3d at 340. If Goode produces "direct
evidence that discriminatory animus played a role" in BNSF's allegedly adverse
employment decision, the burden of persuasion shifts to BNSF to prove that it would have
taken the same action despite any discriminatory animus. *Id.* If, however, Goode produces
only circumstantial evidence of discrimination, he must rely on the indirect, burden-
shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to
establish his disability-discrimination claim. *Id.*

Under the *McDonnell Douglas* framework, Goode must first make out a prima-facie
case of discrimination by showing that he (1) has a disability or was regarded as disabled,

(2) was qualified for the job, and (3) was subject to an adverse employment action on account of his disability. *Id.* (citing *Williams v. J.B. Hunt Transport, Inc.*, 826 F.3d 806, 811 (5th Cir. 2016)). If Goode makes that showing, the burden shifts to BNSF to articulate a "legitimate, non-discriminatory reason for the adverse employment action." *Id.* If BNSF satisfies its burden, the burden shifts back to Goode "to produce evidence from which a jury could conclude that BNSF's articulated reason is pretextual." *Id.*

### 1.   Goode has no direct evidence of discrimination.

Direct evidence is "evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 765 (5th Cir. 2016). "If an inference is required for evidence to be probative as to an employer's discriminatory animus, the evidence is circumstantial, not direct." *Nall*, 917 F.3d at 341. Here, Goode has no evidence reflecting "without inference or presumption" that BNSF made any decision with discriminatory animus. Goode cannot point to any derogatory comments about his alleged disability or his ICD. App. 55 (Goode Dep. 108:1-7). Nor is there any other evidence suggesting discriminatory animus. Thus, Goode has no direct evidence and must rely on the *McDonnell Douglas* framework to prove his disability-discrimination claim.

### 2.   Goode has no circumstantial evidence challenging BNSF's reason for placing restrictions on his work activities.

As to the indirect method of proof, even if Goode could establish a prima-facie case of discrimination, BNSF had a legitimate, non-discriminatory reason for placing

restrictions on Goode's work activities—workplace safety. In particular, Dr. Clark placed the restrictions on Goode because they were necessary given his ICD and the nature of his train-service work. App. 190-91 (Clark Dec. ¶ 7). Dr. Clark acted only on the basis of a concern about safety and in her reasonable medical judgment. App. 190-91 (Clark Dec. ¶ 7). BNSF has, therefore, articulated legitimate, non-discriminatory justifications for not allowing Goode to work in train service. Because Goode has no evidence that BNSF's reason was pretextual—*i.e.*, that BNSF did not really act on the basis of safety he cannot prove discrimination through the indirect method. *See Nall*, 917 F.3d at 348 (holding that dispute on the discrimination element turned on whether employer acted out of discriminatory animus or its real reason for acting was safety).

Evidence "demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case," can support an inference of discrimination. *Nall*, 917 F.3d at 348 (citing *Diggs v. BNSF Ry. Co.*, 742 F. App'x 1, 4 (5th Cir. 2018)). Here, however, Goode has no evidence challenging BNSF's reason for placing restrictions on his work activities. BNSF's safety concerns were directly tied to the nature of Goode's train-service work and the significant safety risks presented by Goode's ICD in the performance of such train-service work. Nor does Goode have any alleged discriminatory comments, any alleged tailoring of the job duties to focus on his particular medical condition, or any of the other evidence deemed in *Nall* sufficient to avoid summary judgment. Therefore, Goode cannot raise a material fact issue as to BNSF's reason for its

actions—its belief that Goode could not safely perform train-service work—and summary judgment thus is appropriate on his disability-discrimination claim for that reason as well.

### C.   BNSF is Entitled to Summary Judgment Because Its Practice of Excluding Individuals with Defibrillators from Working in Train-Service Jobs is Job-Related and Consistent with Business Necessity.

Under the ADA, an employer has an affirmative defense to a discrimination claim if "an alleged application of the qualification standards, test, or selection criteria" that screened out the plaintiff "has been shown to be job-related and consistent with business necessity and such performance cannot be accomplished by reasonable accommodation…" 42 U.S.C. § 12113(a).

The business-necessity defense is distinct from the "direct threat" standard set forth in 42 U.S.C. § 12113(b). *EEOC v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000). It applies to across-the-board safety-based criteria that are justified by being job-related and serving an overall safety interest without assessing the particular risk presented by the individual plaintiff. *See id.* (explaining that the business-necessity defense applies when an "employer has developed a standard applicable to all employees of a given class" and "addresses whether the standard can be justified as an across-the-board requirement" while the "direct-threat" defense applies when addressing individual risks not covered by a general standard).[4] Thus, to establish the business-necessity defense, BNSF is required

---

[4] *See also Wolfe v. U.S. Steel Corp.*, 2013 WL 12099083, at *5-7 (N.D. Ohio July 12, 2013) (rejecting plaintiff's arguments based on individual ability to perform as basis to overcome employer's vision qualification standard), *aff'd*, 567 Fed. App'x 367 (6th Cir. 2014); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 993 (9th Cir. 2007) (noting defendant was "not

only to demonstrate that the standard is job-related for the position in question and that it "substantially promotes" BNSF's legitimate needs. *Atkins v. Salazar*, 677 F.3d 667, 682 (5th Cir. 2011).

BNSF's consistent regular practice has been to disallow those individuals who have an ICD from working in train service jobs. App. 174; 191 (Jarrard Dec. ¶ 21; Clark Dec. ¶ 10). That practice is directly tied to both the job duties and workplace safety, a business necessity under established law. Put simply, the use of an ICD is incompatible with train-service work. App. 170-71; 191 (Jarrard Dec. ¶¶ 10-11; Clark Dec. ¶ 10).[5] Therefore, even if the Court disagrees with BNSF's position in the previous two sections (or chooses not to address those arguments) BNSF is entitled to summary judgment because the exclusion of Goode from train-service work was job-related and consistent with business necessity.

### 1.    BNSF's practice is job-related.

For a qualification standard to be job-related, that standard must relate to the specific skills and physical requirements of the position in question. *Atkins*, 677 F.3d at 682. A safety standard designed to address specific safety risks involved in job performance is job-related. *Id.* at 682 (safety standard for law enforcement park rangers was job-related where it was designed to ensure that employees were physically able to perform law

---

required to meet the requirements of the direct threat defense" for a blanket safety-based standard).

[5] It is immaterial that BNSF's practice is unwritten. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 46 (2003) (upholding employer action based on unwritten policy).

enforcement duties and that their performance did not constitute a threat to the health and well-being of themselves, fellow employees, and park visitors); *Allmond v. Akal Security, Inc.* 558 F.3d 1312, 1317 (11th Cir. 2009) (hearing-aid ban was job-related where officers required a certain level of unaided hearing to adequately and safely perform security services at federal courthouse).

BNSF's practice of excluding individuals with defibrillators or ICDs from performing train-service work thus is job-related because its purpose is to ensure safety while doing the job at issue—train-service work. It addresses risks involved in the performance of the job and therefore is directly related to the specific skills and physical requirements of performing train-service work. *See, e.g., Atkins*, 677 F.3d at 682 (standard's focus on the physical consequences of uncontrolled diabetes was "related to the specific skills and requirements of being a park ranger and, therefore, job-related").

### 2.   BNSF's practice is consistent with business necessity.

A qualification standard is consistent with business necessity where it "substantially promotes the business's needs." *Atkins*, 677 F.3d at 682. Safety of the individual, coworkers, and the general public is always a business necessity. "[A] safe workplace is a paradigmatic necessity of operating a business." *U.S. v. E.E.O.C. v. AIC Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir. 1995); *see also Painter v. Ill. Dep't of Transp.*, 715 F. App'x 538, 541 (7th Cir. 2017) ("Preventing employees from endangering their coworkers is a business necessity…Employers need not retain workers who, because of a disability, might harm someone; such a rule would force an employer to risk a negligence suit to avoid

violating the ADA."); *accord Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007); *Conroy*

*v. New York Dept. of Correctional Servs.*, 333 F.3d 88, 97 (2d Cir. 2003).[6]

Safety standards designed to reduce particular safety risks involved in the

performance of job duties substantially promote safety and are therefore "consistent with

business necessity." *See, e.g., Atkins*, 677 F.3d at 683; *Allmond*, 558 F.3d at 1317-18;

*Wilkerson v. Shinseki*, 606 F.3d 1256, 1264-65 (10th Cir. 2010) (physical qualification

standard that screened out employee because of obesity was justified by business necessity

because of safety risks inherent in position if an emergency situation occurred, despite the

fact that the plaintiff had worked for two years without incident).[7] The Fifth Circuit has

also explained that in assessing safety risks, the nature of the work is important:

> [T]he court should take into account the magnitude of possible harm as well
> as the probability of occurrence. The acceptable probability of an incident will
> vary with the potential hazard posed by the particular position: a probability

---

[6] Congress has also acknowledged that in industries in which safety is a paramount concern, such as transportation, employers have an obligation to ensure that their employees are medically fit to perform the job safely. H.R. Rep. No. 101-485, Pt. 2 at 74, reprinted in 1990 U.S.C.C.A.N. 267, 356-57 (1990).

[7] *See also Wolfe*, 2013 WL 12099083, at *5-7 (vision standard adopted to promote safety justified by business necessity given nature of work environment, which included employees working around heavy equipment such as cranes); *Ruddell v. Triple Canopy, Inc.*, 2016 WL 4529951, at *7-*8 (E.D. Va. Aug. 29, 2016) (amphetamine ban adopted for safety reasons in light of job duties justified); *Bender v. Norfolk S. Corp.*, 994 F.Supp.2d 593, 609 (M.D. Pa. 2014) (after noting the nature of the railroad work environment, stating, "courts routinely grant summary judgment to an employer asserting that a safety-based qualification standard was justified by business necessity when, like here, public safety is implicated," but denying summary judgment because the employer (unlike BNSF) did not put into evidence the specific qualification standard at issue).

that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example.

*Exxon Corp.*, 203 F.3d at 875.

Here, BNSF's practice is a safety standard that is job-related and consistent with business necessity. That is particularly true when considering the nature of work in a railroad environment, which has long been known to present special risks. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 628 (1989) (certain positions, including train-service jobs, involve the "discharge [of] duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences"; "can cause great human loss before any signs of impairment become noticeable to supervisors or others").[8]

As set out above, a train-service position comprises multiple types of assignments, including conductor, that generally is responsible for the safe and efficient movement of trains. App. 169 (Jarrard Dec. ¶ 4). Train-service employees work both in rail yards and in over-the-road trips. App. 172 (Jarrard Dec. ¶ 14). They frequently work around moving and heavy equipment. App. 172 (Jarrard Dec. ¶ 14). They work near multiple tracks spaced as narrowly as 36 inches apart and, consequently, must constantly be aware and in control of

---

[8] *See also* NTSB Safety Rec. R-13-021 (containing repeated NTSB recommendations about reviewing railroad employee medical fitness and stating that an accident resulted from a chronic medical issue and "the conductor's disengagement from his duties.") (https://www.ntsb.gov/SAFETY/safety-recs/_layouts/ntsb.recsearch/Recommendation.aspx?Rec=R-13-021).

their physical presence so as not to be within striking distance of moving equipment on a track (called "fouling the track"). App. 172 (Jarrard Dec. ¶ 14). They communicate instructions to the engineer regarding the make-up of trains and switching of cars. App. 172 (Jarrard Dec. ¶ 14). They climb on and off equipment and ride on moving cars while holding onto a ladder, sometimes for extended periods of time. App. 172 (Jarrard Dec. ¶ 14).

Given those various safety-sensitive duties, use of an ICD is incompatible with train-service work because it necessarily entails a risk of sudden incapacitation and, therefore, presents a substantial risk of significant harm given the nature of train-service work. App. 171 (Jarrard Dec. ¶ 11). The point of the ICD is to reduce the individual's risk of dying if the lower chambers of the heart (ventricles) go into a dangerous rhythm and stop beating effectively (cardiac arrest). App. 169-70 (Jarrard Dec. ¶ 7). The purpose of the device is to restore a normal heartbeat and thus potentially save the life of an individual experiencing a cardiac event. App. 171 (Jarrard Dec. ¶ 12). Even if an ICD works as it should, it does not guarantee that the individual using the device will remain conscious. App. 171; 190-91 (Jarrard Dec. ¶ 12; Clark Dec. ¶ 7). The firing of the device itself will likely render the individual incapacitated for some period of time. App. 171; 190-91 (Jarrard Dec. ¶ 12; Clark Dec. ¶ 7). Thus, an individual needing an ICD necessarily is at an increased risk of sudden incapacitation. App. 171 (Jarrard Dec. ¶ 12).

The risk of incapacitation while performing train-service work places a train-service employee (or others) in a hazardous or potentially life threatening situation. App. 171-72 (Jarrard Dec. ¶ 13). The consequences of sudden incapacitation while performing train-

service work could be injury to the employee, his or her coworkers, or the general public, including a catastrophic rail accident. App. 171-72 (Jarrard Dec. ¶ 13). BNSF has set forth several examples of such risks in section III.D. above. Those examples demonstrate substantial risks when performing routine aspects of train-service work. Accordingly, BNSF's approach of disallowing those who have an ICD from working in train service is both job-related and substantially promotes safety, a well-understood business necessity.

BNSF's approach also is narrowly-tailored in that it does not apply to all safety-sensitive jobs, as demonstrated by BNSF's placement of Goode into a dispatcher position, which also is safety sensitive.. App. 174 (Jarrard Dec. ¶ 21); *cf. Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 232 (3d Cir. 2000) (Alito, J.) (holding that condition presenting risk of incapacitation prevented safe performance of dispatcher position).

BNSF's approach with respect to ICDs in train-service work also is consistent with the approach of federal agencies governing other transportation modes. App. 175 (Jarrard Dec. ¶ 23). The Federal Motor Carrier Safety Administration ("FMCSA"), for example, does not approve an individual with an ICD to work as a commercial truck driver.[9] The Federal Aviation Administration ("FAA") will not approve an individual with an ICD to

---

[9] 49 C.F.R. § 391.41(b)(4), App'x A, Medical Advisory Criteria ("Implantable cardioverter defibrillators are disqualifying due to risk of syncope."); *see also* 84 Fed. Reg. 26727, 26727-28 (June 7, 2019) (explaining that the underlying condition for which an ICD was implanted "places the individual at high risk for syncope (a transient loss of consciousness) or other unpredictable events known to result in gradual or sudden incapacitation" and that "ICDs may discharge, which could result in loss of ability to safely control a [commercial motor vehicle]."); *accord* 84 Fed. Reg. 3532, 3532-33 (Feb. 12, 2019).

work as an airline pilot (or even to obtain a medical certificate to fly as a private pilot).[10] Those limitations result from the same risk of incapacitation that presents significant safety risks for train-service workers. Moreover, it is common in the rail industry, where by contrast to other transportation entities there historically have been few specific regulatory medical standards, to look to those other transportation entities in developing medical standards for railroad employees. App. 175 (Jarrard Dec. ¶ 23).[11] The practices of those agencies therefore bolster BNSF's position with respect to ICD use and train-service work.

In sum, excluding individuals who use an ICD—and therefore necessarily present a risk of sudden incapacitation—from performing train-service work in an environment with heavy, moving railcars, locomotives, and other equipment indisputably is both job-related

---

[10] FAA, Medical Certification Strategies in Response to Technologically Advanced Prosthetic Devices ("As many pilots are using pacemakers that combine pacemaker/internal cardiac defibrillators, it is important to know that the FAA does not currently allow the use of automatic implanted cardioverter defibrillators (AICDs) for any class of medical certificate") (available at: https://www.faa.gov/data_research/research/med_humanfacs/oamtechreports/2010s/media/201807.pdf; FAA Safety Briefing, Q.5 (July/August 2017) (explaining that under FAA policy those with an active defibrillator are not eligible for a medical certificate) (https://www.faa.gov/news/safety_briefing/2017/media/JulAug2017.pdf); *see also* FAA, Order 3930.3C, Appendix A, Medical Standards, Item 7.a.(6) (same for Air Traffic Control Specialists: "No established medical history or clinical diagnosis of…(6) Automatic implantable cardioverter defibrillator….") (available at: https://www.faa.gov/documentLibrary/media/Order/FAA_Order_3930.3C.pdf).

[11] The Federal Railroad Administration ("FRA") recognizes that railroads will have medical standards and has implicitly approved such standards that prohibit certain medical devices. Specifically, in stating what devices are permitted, the FRA lists: "A medical device that is consistent with the railroad's standards for medical fitness for duty." 49 C.F.R. § 220.309(e). The FRA thus recognizes and approves of the fact that there will be medical devices that railroads disallow.

and substantially promotes the business necessity of safety. That approach therefore is job-related and consistent with business necessity. Accordingly, BNSF is entitled to summary judgment on that basis in addition to, or in the alternative to, the grounds stated above.

### D.   Goode Has No Failure-to-Accommodate Claim.

Goode pleads that section 12112(b)(5)(A) of the ADA defines discrimination against a qualified individual on the basis of disability "as including not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." Doc. 17, Pl.'s First Am. Compl. ¶ 18. It thus is unclear whether Goode means to be asserting a claim for failure-to-accommodate his alleged disability. To the extent he means to do so, the Court should reject the claim for the following reasons.

First, he has not adequately pleaded such a claim. Merely citing and quoting from a statute does not satisfy Rule 8(a)'s pleading standard. *See* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"; a complaint must plead "*factual content* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (emphasis added); *Durham v. Ascension Par. Sch. Bd.*, 624 F. App'x 237, 238-39 (5th Cir. 2015) (per curiam) (affirming dismissal of failure-to-accommodate claim where, even though plaintiff alleged that her employer "denied her requests for reasonable accommodations," she failed to offer factual support for the

violation). The Complaint is devoid of factual allegations supporting any failure-to-accommodate claim.

Second, Goode failed to exhaust his administrative remedies as to any failure-to-accommodate claim because he did not raise it in his EEOC charge. Indeed, Goode admits that the even he complained about was failing to bring him back to work. App. 88, 89, 90, 205 (Goode Dep. 157:1-8, 158:2-14, 159:4-21; EEOC Charge). *See Dao v. Auchan Hypermarket*, 96 F.3d 787, 789 (5th Cir. 1996) (administrative exhaustion is required for ADA claims).

Third, Goode's admission that he did not ask anyone at BNSF for a modification so that he could perform the conductor job safely, App. 62 (Goode Dep. 126:7-10), necessarily precludes a failure-to-accommodate claim. *See e.g., Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 791 (5th Cir. 2017) (citing *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216 (5th Cir. 2011)) ("Employees who require accommodation due to a disability are responsible for requesting a reasonable accommodation.").

Finally, as Dr. Jarrard explained, Goode could not be accommodated in the conductor position because his restrictions were such that he could not perform the essential functions of that job, and in any event BNSF accommodated him by helping him secure a different job. App. 127 (Jarrard Dep. 32:5-15); *see also* App. 196-97 (Folley Dec. ¶¶ 5-7).

## V.    <u>CONCLUSION</u>

For the reasons discussed above, BNSF asks the Court to dismiss Goode's claim with prejudice, order that Goode take nothing, and award BNSF its costs.

Dated: July 5, 2019.

Respectfully submitted


/s/Bryan P. Neal
Bryan P. Neal
Texas Bar No. 00788106
Lauren Timmons
Texas Bar No. 24093265
THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214).969-1700
Fax: (214).969-1751
Email: Bryan.Neal@tklaw.com
Email: Lauren.Timmons@tklaw.com

ATTORNEYS FOR DEFENDANT
BNSF RAILWAY COMPANY

## CERTIFICATE OF SERVICE

I certify that on July 5, 2019, a copy of this document was electronically filed. Notice of this filing will be sent to all counsel of record by operation of the Court's Electronic Filing System.

/s/Bryan P. Neal
Bryan P. Neal


031432.000676 22489294.5

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT – PAGE 41**